Ashkon E. Cyrus, Esq., SBN 314523
ashkon@selectip.com
**Select IP Law Corporation**
475 Washington Blvd
Marina Del Rey, CA 90292
ATTORNEY FOR PLAINTIFF CRAIG SCHMITMAN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRAIG SCHMITMAN, an individual,<br><br>Plaintiff(s),<br><br>vs.<br><br>AERO COSMETICS PRODUCTS, LLC, a Texas limited liability company; BRIAN PHILLIPS; JOSE CASTELLANOS; and DOES 3-10, inclusive,<br><br>Defendant(s). | Case No.: 2:25-cv-09205-AH-MBK<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Craig Schmitman ("Plaintiff" or "Artist") alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for damages and injunctive relief against Defendants Aero Cosmetics Products, LLC ("Company"), Brian Phillips, and Jose Castellanos (collectively "Defendants"). The action arises from Defendants' unlawful and

unpermitted use, misappropriation, and replication of Plaintiff's distinctive voice through artificial intelligence ("AI") cloning. Defendants' actions constitute a clear violation of Plaintiff's statutory and common law rights, including California's right of publicity under Civil Code section 3344, common law misappropriation of likeness, invasion of privacy, unfair competition, and misrepresentation.

## II. THE PARTIES

2. Plaintiff CRAIG SCHMITMAN is an individual residing in the State of California. Plaintiff is a professional voiceover artist with a distinctive and recognizable voice.

3. Defendant AERO COSMETICS PRODUCTS, LLC is a limited liability company organized and existing under the laws of Texas, with its principal place of business in Texas.

4. Upon information and belief, Defendant Brian Phillips is an individual and a citizen of the State of Texas and is the Chief Executive Officer of the Company.

5. Upon information and belief, Defendant Jose Castellanos is an individual and a citizen of the State of Texas, and an employee of the Company.

6. Plaintiff is still investigating the true names and capacities of defendants sued herein as DOES 3-10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

## III. JURISDICTION AND VENUE

7. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff (a citizen of California) and all Defendants (citizens of Texas) and

the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over Defendant Aero Cosmetics Products, LLC, because it conducts regular and substantial business in California, including advertising, selling and shipping its products to residents of this state.

9. All Defendants purposefully engaged in wrongful conduct expressly aimed at Plaintiff in this forum. Specifically, Defendants knowingly and intentionally took Plaintiff's voice without consent and used it to impersonate or clone Plaintiff, publishing or distributing the impersonation in a manner that caused harm to Plaintiff's business and reputation.

10. This Court also has personal jurisdiction over the individual Defendants, Brian Phillips and Jose Castellanos. These Defendants committed intentional, tortious acts by participating in, authorizing, and/or directing the creation and commercial use of an unauthorized AI-clone of Plaintiff's voice. Defendants knew Plaintiff is a resident of California and that his professional voiceover business and reputation are centered in California. Defendants' conduct was expressly aimed at California, as they intended the harm from their misappropriation, including the usurpation of his professional identity and the diversion of his income, to be felt by Plaintiff in this forum. As a direct and proximate result, Plaintiff suffered harm to his business, reputation, and livelihood in California, a result Defendants knew was likely to occur from their actions.

11. Furthermore, upon information and belief, Defendants Phillips and Castellanos are alter egos of the Company, rendering their interests and actions legally indistinguishable for purposes of jurisdiction.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, Plaintiff resides in this District, and the harm from

Defendants' misappropriation was directed at and primarily felt by Plaintiff in this District.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Professional Recognition, Fame, and Distinctive Voice

13. Plaintiff Craig Schmitman is a highly respected and recognizable performer including the roles of voiceover artist, live program host, and broadcast journalist. His voice is unique and distinctive, and he has built a professional career based on its commercial use.

14. Plaintiff's vocal distinctiveness and fame are well-documented in third-party records, including the Internet Movie Database (IMDb), where he is listed under "Craig Schmitman". Plaintiff's credits include appearances on the show Baywatch (as an air traffic controller), Rescue 911, and the documentary Tiltrotor and the Future, appearances which were secured specifically because of Plaintiff's voice, performance, and subject-matter expertise.

15. Plaintiff's professional renown extends to traditional broadcast media as well, where he has been featured on major television networks including The History Channel, The Military Channel, and The Discovery Channel.

16. Plaintiff's status as a trusted voice in the aerospace and news industries is further established by his tenure as a reporter for KFWB in Los Angeles and appearances on National Public Radio (NPR), both locally and nationally. He maintains a public profile with KCRW, further evidencing his status as a public figure whose voice carries specific goodwill and authority in the aerospace industry.

17. Plaintiff remains an established force in modern digital media within his field. In 2025, Plaintiff's reach extends to the live-streaming platform Twitch, under the handle "AeroSpaceNews." According to third-party tracking data (https://twitchtracker.com/aerospacenews), Plaintiff ranks in the Top 0.31% of all streamers on the platform.

18. Plaintiff’s commercial appeal and influence in his field are further evidenced by the fact that he has been featured on the Twitch "Front Page", the platform's most exclusive and visible placement, on three separate occasions. His audience is highly engaged, consuming hundreds of thousands of hours of his live content annually.

19. Plaintiff’s authority and "viral" reach within the aviation community extend significantly to the YouTube platform. For example, a single video regarding aviation technology, written and presented by Plaintiff, has garnered over 1,400,000 views and accumulated over 58,300 hours of watch time.

20. Plaintiff’s voice possesses independent commercial value in the corporate aerospace sector, separate and apart from his own channels. Plaintiff has been engaged to voice, write, and direct high-performance trade show videos for established industry titans, including Genesys Aerosystems (subsequently acquired by Moog Avionics).

21. Plaintiff’s credits, including those for AeroSpaceNews.com, appear on-screen during television and internet broadcasts, creating a direct link in the consumer's mind between Plaintiff's visual identity, his name, and his distinctive voice.

22. Defendants possessed direct, actual knowledge of Plaintiff’s identity and the commercial value of his voice, having previously engaged Plaintiff to perform voiceover services for the Company’s own marketing materials. Upon information and belief, this prior, authorized work occurred at least in 2010-2011. A prime example of this prior, authorized work is a promotional video featuring Plaintiff's original narration, which was publicly posted to YouTube by Defendants (or their predecessors) on their “Wash Wax” YouTube channel on or about January 2011. As of April 23, 2025, that video had accumulated approximately 43,824 views.

23. Crucially, this means the Company’s own customer base had already been extensively exposed to Plaintiff’s voice via this prior work. This demonstrates

that Defendants were not only aware of Plaintiff, but had already capitalized on the established public reach and commercial authority associated with Plaintiff's voice in connection with the Company's specific products.

**B. The Defendants' Prior Sponsorship and June 2024 Agreement**

24. As mentioned, Defendant AERO COSMETICS PRODUCTS, LLC previously engaged Plaintiff for legitimate commercial projects, utilizing his distinctive voice for various purposes, for which Company duly compensated Plaintiff.

25. Crucially, this relationship included a specific sponsorship agreement for Plaintiff's AeroSpaceNews media outlet, which operates as a sole proprietorship of Plaintiff.

26. On or about June 2024, Defendants visited Plaintiff's website to select and purchase a specific sponsorship package listed as: "Live Stream | Monthly Mentions (Once Per Stream) – $2,125.00."

27. By selecting this specific "Live Stream" package, Defendants acknowledged that Plaintiff's voice and presence on the Twitch platform held significant commercial value ($2,125.00 per month). Furthermore, the Defendants products were mentioned specifically on Plaintiff's Twitch stream as part of this agreement, directly associating the Wash Wax products with Plaintiff's live, unscripted persona.

28. Plaintiff performed extensive work to fulfill this sponsorship, going to great lengths to endorse the "Wash Wax" products beyond a mere script reading.

29. In every stream, Plaintiff provided a verbal endorsement of the products. Plaintiff explicitly mentioned his past professional work with Defendants, personally endorsed the quality of the "Wash Wax" product line, and vouched for the Defendants' customer service and reviews.

30. Plaintiff also displayed a "Wash Wax" promotional panel on his Twitch channel continuously for 30 days. Additionally, Plaintiff programmed timed

messages to appear in the live chat, providing clickable direct links to the Defendants' products.

31. The sponsorship message was displayed and verbally delivered three times per stream, during streams that aired three times per week.

32. This sponsorship campaign was highly effective. Plaintiff received direct messages from consumers confirming they had ordered the product as a direct result of the advertising and Plaintiff’s endorsement.

33. This sponsorship was a targeted endorsement deal specifically for Defendants. By virtue of this intensive sponsorship and the resulting sales, consumers of Plaintiff’s media outlet had been conditioned to associate Plaintiff’s voice with the "Wash Wax" product line. Because the customers gained from this sponsorship would recognize Plaintiff's voice as the specific endorser of these goods, Defendants were fully aware that Plaintiff’s voice carried secondary meaning and commercial authority regarding their specific products.

34. The distinctiveness and reach of Plaintiff’s voice extends even beyond his own broadcasts. Viewers in the chat rooms of third-party streams, channels not affiliated with or controlled by Plaintiff, explicitly recognized and identified Plaintiff’s voice when discussed or heard in other contexts.

35. Through this sponsorship, Plaintiff used his distinctive voice and trusted persona to endorse these specific products on his AeroSpaceNews channel. Defendants compensated Plaintiff for this endorsement because they recognized the commercial value of his voice and his specific influence over their target demographic.

36. As a mandatory condition of finalizing this transaction, Defendants were required to affirmatively assent to Plaintiff's Terms and Conditions. Specifically, Defendants executed the purchase by affirmatively checking a box stating “click to agree to our license and purchase terms and conditions,” acknowledging that they had read and agreed to the "License Terms."

37. By checking this box to complete the purchase, Defendants reaffirmed their limited rights to Plaintiff's voice and entered into a binding written agreement ("The June 2024 Agreement") regarding the scope of use as well as venue.

38. The June 2024 Agreement included an "ENTIRE CONTRACT" integration clause, expressly acknowledging that Defendants had read and understood the terms. Specifically, the agreement stated: "YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS. YOU FURTHER AGREE THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN YOU AND ASNC, WHICH SUPERSEDES ANY PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER COMMUNICATION BETWEEN YOU AND ASNC RELATING TO THE SUBJECT OF THIS AGREEMENT."

39. Crucially, the June 2024 Agreement contained a specific "LEGAL FEES AND JURISDICTION" clause, wherein Defendants agreed to reimburse Plaintiff for legal costs and consented to California jurisdiction.

40. The clause states: "If ASNC is obligated to go to court to enforce any of its rights, or to collect any fees, you agree to reimburse ASNC for its legal fees, costs and disbursements if ASNC is successful. You agree that the Superior Court of California, Ventura County and the United States District Court for the District of California are the agreed and appropriate forums for any such suit, and consent to service of process by registered mail or overnight courier with proof of delivery."

41. The June 2024 Agreement contained a "Reservation of Rights" clause that stated: "ASNC reserve all rights in and to the Content other than those rights that have been expressly granted to You in a License Agreement or these License Terms. Without limiting the generality of the foregoing, except as expressly granted in a License Agreement, You may not, directly or indirectly, sublicense any rights granted herein or redistribute any Content. In addition, You may not re-publish, re-display,

re-transmit, re-broadcast or otherwise subsequently exploit any Content licensed hereunder, including in any re-purposing (such as compilations, online archives, screen shots), without a separate Invoice or License Agreement expressly authorizing such activities."

42. Furthermore, the June 2024 Agreement imposed an affirmative duty on Defendants to safeguard Plaintiff's Content from third-party exploitation.

43. Specifically, the "Unauthorized Use" clause of the June 2024 Agreement stated: "You agree to take all reasonable efforts to prevent third parties from misappropriating or obtaining unauthorized access, use or transmission of the Content (collectively "Unauthorized Use")."

**C. The Defendants' Unauthorized Conduct and False Continuity**

44. Despite this established professional relationship and Defendants' clear knowledge that Plaintiff's voice required consent and compensation for its use, Defendants subsequently decided to cease paying Plaintiff for his voice and instead unlawfully steal and replicate it. Crucially, no agreement between Plaintiff and Defendants, past or present, ever contemplated or authorized the creation or use of a digital replica of Plaintiff's voice, reflecting California's strong public policy against such unauthorized uses as codified in laws like AB 2602.

45. Without Plaintiff's knowledge or consent, Defendants developed and commercialized an impersonation AI model trained by using samples of Plaintiff's prior professional work without authorization. This AI model created an exact digital replica of Plaintiff's voice, a use expressly prohibited by California law without prior consent.

46. Defendants then began using this AI-cloned voice in marketing videos for products sold by Company and to promote Company's products on public internet platforms such as YouTube. These videos containing the AI-cloned voice were published on their channel, located at https://www.youtube.com/@WashWaxALL, which has accumulated over 185,000 views.

47. By using Plaintiff's voice to sell the same products he previously did voiceover work for and sponsored on his program, Defendants created a false continuity. Consumers viewing the AI-narrated video would reasonably and inevitably assume that Plaintiff had been hired again to endorse the product, just as he had been in the past. This was a deliberate attempt to trade on the goodwill and trust Plaintiff had built with his audience regarding these specific goods.

48. As evidence of this unethical scheme to deprive Plaintiff of his voice, income and rights, an employee of Company, Defendant Jose Castellanos expressly admitted, in writing, to utilizing a cloned AI-generated voice trained on Plaintiff's prior work specifically "modeled after previous work with us" for a product video connected to the "Wash Wax Mop" product.

49. Defendant Jose Castellanos further admitted to using Artist's AI-cloned voice without Artist's consent, despite being aware that the Company had been unable to secure Artist's approval. The unauthorized AI replication of Plaintiff's voice was also used in connection with marketing and promotional content specifically designed to promote and encourage sales of Company’s products.

50. On or about April 22, 2025, a video containing Plaintiff's AI-cloned voice was publicly distributed, including appearing on Plaintiff's own YouTube feed, thus constituting public distribution and commercial promotion. The video in question was an advertisement, posted on April 22, 2025, with the title "How to Use the Waterless Wash Wax Mop by Aero Cosmetics!," and the following hashtags: #AeroCosmetics #WaterlessWash #RVcleaning. The accompanying YouTube video description stated: "In this video, we dive into all the fantastic features of this revolutionary tool, originally developed for aircraft cleaning. Now, it's perfect for keeping your RV, boat, and other large vehicles clean and protected without the need for water. ⭐ Whether you're a seasoned cleaner or new to waterless washing, this tool makes the process faster, safer, and easier. Say goodbye to the hassle of traditional washing and hello to a sparkling clean vehicle with Aero Cosmetics! Don't

forget to like, comment, and subscribe for more useful tips." This advertisement also prominently featured product links under the heading "Product Links," within its description, such as "Waterless Wash Wax Mop Kit 15" at https://tinyurl.com/2x75dv3j and "Wet or Waterless Wash Wax Mop Kit 10" at https://tinyurl.com/4pkarbwz, directly linking viewers to the Company's products.

51. The "Wash Wax Mop" products advertised in the infringing video are premium-priced, commercially successful products for the Company. Upon information and belief, these products are widely sold on public e-commerce platforms, including Amazon.com. A single listing for the "Aero Cosmetics Waterless RV Aircraft Boat Wash Wax Mop Kit" retails for approximately $229.99 and has generated over 530 ratings, with an average customer review of 4.7 out of 5 stars. This demonstrates the product's high retail value, significant sales volume, and valuable market reputation, which Defendants sought to unlawfully promote using Plaintiff's stolen voice.

52. Upon information and belief, the voice samples used by Defendants to train the AI model and create the digital replica were taken from Plaintiff's prior, authorized voiceover work for the Company.

53. Defendants' conduct further demonstrates an intent to continue exploiting Plaintiff's vocal likeness, as evidenced by an express desire to "create a new voiceover that matches the earlier result's vocal quality," an admission of ongoing infringement.

54. Upon information and belief, after Plaintiff objected to the unauthorized use of his AI-cloned voice, Defendants removed the infringing video titled "How to Use the Waterless Wash Wax Mop by Aero Cosmetics!" from their YouTube channel. This removal does not cure the past infringement or the harm caused, nor does it negate Defendants' previously expressed intent to replicate Plaintiff's vocal quality. Defendants were actively engaged in the exploitation of Plaintiff's voice right up until the moment they were caught. Absent Plaintiff's intervention, Defendants'

unauthorized use would be ongoing. Furthermore, the removal of the specific video does not evidence the destruction of the underlying AI voice model. This underscores Defendants' awareness of their wrongful conduct and demonstrates their ability to control the infringing content, highlighting the necessity of a permanent injunction to prevent future violations.

55. Despite representing to "prevent third parties" from obtaining the content, Defendants did the exact opposite. Upon information and belief, Defendants actively uploaded Plaintiff's voice to the servers of a third-party AI platform (ElevenLabs), thereby voluntarily transmitting Plaintiff's voice to an external entity for the specific purpose of unauthorized cloning.

56. The acceptance of the Terms of Service of both YouTube and ElevenLabs by the Company as well as its employees, Defendants Phillips and Castellanos, is a critical aspect of the misrepresentation claim. Both platforms require users to warrant that they hold all necessary rights to the content being uploaded or used. Specifically, the Terms of Service for YouTube and ElevenLabs include provisions that mandate users to affirm that they possess the legal rights to the content they upload or utilize on these platforms.

57. By accepting these terms, the Defendants explicitly represented that they had the necessary rights to the content in question. However, the Plaintiff asserts that these representations were intentionally false. The Defendants did not hold the required rights to the AI-cloned voice used in their content, thereby breaching the warranties provided to YouTube and ElevenLabs. This act was a direct violation of their promise to Plaintiff to prevent third-party transmission.

58. This intentional misrepresentation is further evidenced by the Defendants' continued use of the AI-cloned voice despite lacking the necessary permissions. The Plaintiff contends that the Defendants' actions were not only a violation of the Terms of Service but also a deliberate attempt to deceive both the platforms and the Plaintiff.

59. On August 22, 2025, Plaintiff's counsel emailed Company's principal, defendant Brian Phillips, stating: "If we do not receive a response from your insurer or another authorized representative within 48 business hours, we will proceed with filing the attached formal complaint without further delay."

60. Instead of responding in good faith, Defendants executed a campaign of deception. This conduct was actively designed to lull Plaintiff into a false sense of security and induce his forbearance from filing this action. On August 25, 2025, Defendants Phillips bought his first delay, representing to counsel: "The insurance company has 30 days to determine coverage. They said I will probably have something by end of this week."

61. On September 4, 2025, after weeks of waiting, Plaintiff's counsel gave a final warning: "Please be advised that the time for your insurance carrier to confirm coverage has now expired."

62. On Friday, September 5, 2025, Defendant Phillips responded with an even more specific, and knowingly false, representation to stall Plaintiff: "I heard back from the insurance... the adjuster assigned to my case was out of the office... They assured me that everything will be wrapped up Monday and they will be contacting me Tuesday on what's next."

63. Defendants' representations were knowingly false and made in bad faith. The representations were a fraudulent pretext intended to induce Plaintiff's forbearance from filing this Complaint. Defendants had no intention of resolving the matter as represented; rather, they were actively and secretly preparing their own litigation. Upon information and belief, no such insurance claim was active, or the carrier had already denied coverage, making the representation objectively false when made.

64. As a direct result of Defendants' fraudulent inducement and bad-faith delays, Plaintiff was left with no choice but to file his original Complaint in Los Angeles Superior Court on September 9, 2025. On that very same day Defendant

Phillips had "assured" Plaintiff a resolution would be forthcoming, Defendants executed their ambush, preemptively filing a declaratory judgment action against Plaintiff in the United States District Court for the Western District of Texas (Aero Cosmetics Products, LLC v. Craig Schmitman, Civil Action No. 5:25-cv-01127). This duplicitous conduct and bad-faith race to the courthouse reveals the oppressive nature of Defendants' entire course of conduct.

65. Defendant Aero Cosmetics Products expressly admits in Paragraph 6 of its Declaratory Judgment action that it engaged Schmitman to record voice-overs for promotional videos.

66. Defendant Aero Cosmetics Products further admits in Paragraphs 9 and 10 of its Declaratory Judgment action that an employee utilized an AI resource to adapt those prior recordings and created the AI adaptation during March of 2025.

67. Furthermore, by admitting in Paragraph 14 of its Declaratory Judgment action that it “began” to withdraw the AI adaptation from its social media and website only after Schmitman objected, Defendant Aero Cosmetics Products concedes that the unauthorized AI adaptation was, in fact, published and commercially disseminated to the public via social media and website. Defendants’ conduct was knowing, willful, and malicious, as demonstrated by their admissions to cloning Plaintiff's voice despite knowing they lacked consent, and as further evidenced by their subsequent campaign of fraudulent misrepresentations to Plaintiff's counsel to delay legal action. This conduct warrants punitive damages.

68. This fraud is further evidenced by Defendants' representations to YouTube, ElevenLabs, and the public, wherein they warranted they had the rights to Plaintiff's voice when they knew they did not.

69. Plaintiff asserts rights in his vocal identity and persona, which are distinct from any copyrightable interest in the specific sound recordings used to train the AI. Defendants did not merely copy a file; they misappropriated the functional

equivalent of Plaintiff's identity to generate *new* content that Plaintiff never performed.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of California Civil Code § 3344 (Right of Publicity) (against all Defendants)

70. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

71. California Civil Code section 3344 prohibits the commercial use of a person's voice without prior consent.

72. Defendants knowingly and intentionally used Plaintiff's voice, including by creating and commercially exploiting a digital replica of his voice, in connection with the advertising, selling, or soliciting purchases of its products and services, without Plaintiff's prior consent, in direct violation of California Civil Code section 3344.

73. Defendants' use of Plaintiff's AI-cloned voice in promotional videos directly benefited Defendants commercially.

74. As a direct and proximate result of Defendants' unauthorized use of Plaintiff's voice, Plaintiff has suffered and continues to suffer damages, including statutory damages, general damages, and special damages.

75. Having previously engaged Plaintiff, Defendants knew consent and compensation were required. Their subsequent creation and use of a digital replica of his voice demonstrates a deliberate, willful, and malicious scheme entitling Plaintiff to punitive damages.

### SECOND CAUSE OF ACTION

### Common Law Misappropriation of Name and Likeness (Against All Defendants)

76. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

77. Defendants appropriated Plaintiff's voice and likeness for its own commercial benefit.

78. Plaintiff’s voice has a distinctive and recognizable quality, and its use by Defendant was directly linked to Defendants’ commercial enterprises.

79. Defendants’ appropriation of Plaintiff’s voice was without Plaintiff’s consent.

80. As a direct and proximate result of Defendants’ misappropriation, Plaintiff has suffered and continues to suffer damages, including lost income, reputational harm, and general damages.

## THIRD CAUSE OF ACTION

### Invasion of Privacy – Appropriation of Identity (Against All Defendants)

81. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

82. Defendants appropriated Plaintiff's identity, specifically his distinctive voice, for its own commercial advantage.

83. Defendants’ use of Plaintiff’s voice in its promotional materials invaded Plaintiff’s right to control the commercial use of his identity.

84. Defendants’ actions were highly offensive to a reasonable person.

85. As a direct and proximate result of Defendants’ invasion of privacy, Plaintiff has suffered and continues to suffer damages, including emotional distress, embarrassment, and general damages.

## FOURTH CAUSE OF ACTION

### Unfair Competition (Cal. Bus. & Prof. Code § 17200, et seq.) (Against All Defendants)

86. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

87. Defendants’ conduct, including the unauthorized AI cloning and commercial use of Plaintiff’s voice, constitutes an unlawful, unfair, and fraudulent business act or practice within the meaning of California Business and Professions Code section 17200, et seq.

88. Defendants’ actions are unlawful because they violate California Civil Code section 3344, common law misappropriation, and invasion of privacy.

89. Defendants’ actions are unfair because they are oppressive and substantially injurious to Plaintiff and other voice artists, providing Defendant an unfair competitive advantage by avoiding legitimate licensing, performance and production fees.

90. Defendants’ actions are fraudulent because they create the false impression that Plaintiff endorsed or participated in the creation of Defendant’s materials.

91. As a direct and proximate result of Defendant’s unfair competition, Plaintiff has suffered and continues to suffer damages, including lost business opportunities and lost revenue.

92. Plaintiff seeks injunctive relief to prevent Defendant from continuing its unlawful, unfair, and fraudulent business practices.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation (Against All Defendants)**

93. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

94. As a direct result of their prior, established professional relationship, Defendants and Plaintiff were in a special relationship that imposed upon Defendants a duty to use reasonable care when making representations regarding the use of Plaintiff's voice and professional identity.

95. Plaintiff had performed legitimate work for Defendant Aero Cosmetics and was previously a sponsored partner. This prior established professional history,

combined with the execution of the June 2024 Agreement, created a special relationship that imposed upon Defendants a duty to use reasonable care when making representations regarding the security, scope of use, and protection of Plaintiff's voice and professional identity.

96. These representations were false. Defendants had no reasonable grounds for believing they were compliant with these representations because shortly thereafter they were actively "re-purposing" Plaintiff's prior voice work to train an AI model.

97. Regarding the representation that they would "prevent third parties" from obtaining the content, Defendants did the exact opposite. Upon information and belief, Defendants actively uploaded Plaintiff's voice files to the servers of a third-party AI platform (ElevenLabs), thereby voluntarily transmitting Plaintiff's proprietary content to an external entity for the specific purpose of unauthorized cloning. This act was a direct breach of their promise to prevent third-party transmission.

98. Company, through its agents and employees, made representations to Plaintiff regarding the use of Plaintiff's voice, including admissions of using an AI-generated voice "modeled after previous work with us."

99. These representations were made without reasonable grounds for believing them to be true, given the lack of consent and the commercial use of the AI-cloned voice.

100. Moreover, in light of the Defendants' acceptance of the Terms of Service of both YouTube and ElevenLabs, each requiring a warranty that the user holds all necessary rights to the content being uploaded or used, such representations may be asserted as false.

101. Plaintiff reasonably relied on Defendants' representations, specifically the contractual promises that his voice would not be re-purposed or exposed to third

parties, in continuing to provide access to his content and maintaining the professional relationship.

102. Plaintiff also relied on the implicit understanding that his voice would not be used without consent or compensation and was damaged when it was.

103. As a direct and proximate result of Defendant's negligent misrepresentations, Plaintiff has suffered and continues to suffer damages, including the misappropriation of his voice, loss of control over his professional identity, and commercial harm.

## SIXTH CAUSE OF ACTION

### Intentional Misrepresentation (Against Defendants Aero Cosmetics Products, LLC and Brian Phillips)

104. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

105. On or about June 2024, Defendants made material representations to Plaintiff to induce him to enter into the Sponsorship Agreement. Specifically, Defendants affirmatively agreed to the "License Terms," representing that they would: a. Not "re-purpose" or "subsequently exploit" content without a new license; b. "Prevent third parties" from accessing content; and c. Submit to the exclusive jurisdiction of courts in California.

106. At the time Defendants made these promises, they had no intention of performing them. Upon information and belief, Defendants made these representations with the intent to obtain Plaintiff's endorsement for its products, and with the intent to disregard the California venue provision should a dispute arise.

107. Further, beginning in August 2025, Defendants engaged in a secondary scheme of fraud designed to delay Plaintiff's legal action. Defendant Brian Phillips made the following specific, written representations to Plaintiff's counsel: a. August 25, 2025: Defendant Phillips stated, "The insurance company has 30 days to determine coverage. They said I will probably have something by end of this week."

b. September 5, 2025: Defendant Phillips stated, "I heard back from the insurance... They assured me that everything will be wrapped up Monday and they will be contacting me Tuesday on what's next."

108. These representations were knowingly false when made. Upon information and belief, there was no pending insurance coverage determination that required a delay until "Tuesday." In reality, Defendants were utilizing this time to secretly prepare and file a Declaratory Judgment action in the Western District of Texas (Aero Cosmetics Products, LLC v. Craig Schmitman, Civil Action No. 5:25-cv-01127).

109. Had Plaintiff known Defendants would actively violate the "re-purposing" clause they just signed, or that they planned to drag him into litigation in Texas contrary to the express venue agreement, Plaintiff would have immediately terminated the relationship and sought legal redress in June 2024.

110. Defendant, through its agents and employees, made representations, including the purported inability to secure Artist's approval, while knowing or recklessly disregarding that they were proceeding with the unauthorized use of Plaintiff's AI-cloned voice.

111. Defendants made these false representations with the specific intent to deceive Plaintiff and to induce Plaintiff to forbear from filing this legal action and seeking an immediate injunction.

112. Plaintiff justifiably relied on these representations from a party principal and, in good faith, delayed filing the Complaint.

113. These representations were made with the intent to deceive Plaintiff and/or to induce Plaintiff to refrain from taking protective action.

114. Plaintiff, unaware of the full extent of the unauthorized use, acted or refrained from acting in reliance on these misrepresentations.

115. As a direct and proximate result of Defendant's misrepresentations, Plaintiff has suffered and continues to suffer damages, including the costs incurred in

defending against the improper Texas filing, damages that would not have been incurred had Defendants not fraudulently induced Plaintiff to delay his filing in California.

**SEVENTH CAUSE OF ACTION**

**False Endorsement (Lanham Act § 43(a), 15 U.S.C. § 1125(a)) (Against All Defendants)**

116. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

117. Plaintiff's Mark: Plaintiff is a professional voiceover artist whose voice is unique, distinctive, and broadly recognizable. Through years of broadcasting, including reaching the top 0.31% of creators on Twitch, Plaintiff has cultivated substantial professional goodwill. Plaintiff's distinctive voice serves as an indicator of origin for his professional services, has acquired secondary meaning in the marketplace, and constitutes a protectable mark or symbol under 15 U.S.C. § 1125(a).

118. Defendants were intimately familiar with the commercial value of Plaintiff's voice, having previously engaged and compensated Plaintiff to use his voice to endorse their specific goods. Defendants are therefore estopped from denying the distinctiveness of the mark they previously paid to license. Defendants, without Plaintiff's knowledge or consent, created and used in commerce an AI-generated replica of Plaintiff's unique and distinctive voice. This AI-cloned voice was incorporated into commercial advertising for Defendants' products published on public internet platforms, including YouTube.

119. Defendants' use of the AI clone creates an inevitable likelihood of confusion among consumers. Defendants did not merely use the voice for a random product; they used the AI clone to sell the exact same products ("Wash Wax") that Plaintiff had previously promoted under legitimate video productions and on his streaming program. This created a false continuity, leading consumers to mistakenly

believe that Plaintiff was continuing to endorse the product and had participated in the creation of the new promotional video.

120. Defendants' use of Plaintiff's AI-cloned voice in their commercial advertising constitutes a false or misleading representation of fact, which is likely to cause confusion, mistake, or deception among consumers as to the affiliation, connection, or association of Plaintiff with Defendants, and/or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Plaintiff. Specifically, Defendants' use falsely implies that Plaintiff endorses Defendants' "Wash Wax Mop" products and the Aero Cosmetics brand.

121. Defendants' actions were taken knowingly, willfully, and with the deliberate intent to trade on the goodwill and recognition associated with Plaintiff's distinctive vocal identity, which Defendants knew required consent and compensation based on their prior relationship with Plaintiff. Defendants' conduct, including the admissions of Defendant Castellanos and the fraudulent misrepresentations made by Defendant Phillips, demonstrates that this infringement was malicious, fraudulent, and oppressive.

122. As a direct and proximate result of Defendants' false endorsement, Plaintiff has suffered and continues to suffer damages, including irreparable harm to his professional reputation and goodwill, loss of control over his professional identity, and lost commercial opportunities.

123. Defendants' conduct constitutes willful and deliberate infringement under the Lanham Act, entitling Plaintiff to enhanced damages, including disgorgement of Defendants' profits, treble damages, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

124. Plaintiff has no adequate remedy at law and is entitled to injunctive relief permanently enjoining Defendants from using Plaintiff's voice or any simulation thereof in commerce.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CRAIG SCHMITMAN prays for judgment against Defendants AERO COSMETICS PRODUCTS, LLC, BRIAN PHILLIPS, and JOSE CASTELLANOS, jointly and severally, as follows:

1. For general damages in an amount according to proof at trial;
2. For special damages according to proof, but in no event less than $200,000;
3. For statutory damages pursuant to Civil Code § 3344;
4. For punitive and exemplary damages in an amount sufficient to punish and deter Defendants from future misconduct;
5. For restitution and disgorgement of all ill-gotten gains, revenues, and profits that Defendants acquired as a result of their unfair and unlawful business practices, in an amount according to proof;
6. For an award of Defendants' profits and any damages sustained by Plaintiff as a result of Defendants' violation of the Lanham Act, with such amounts to be trebled, pursuant to 15 U.S.C. § 1117(a) based on Defendants' willful, malicious, and fraudulent conduct;
7. For Plaintiff's reasonable attorneys' fees and costs incurred in this action, pursuant to Civil Code § 3344 and 15 U.S.C. § 1117(a), based on this being an exceptional case arising from Defendants' willful infringement;
8. For injunctive relief, permanently enjoining Defendants from:
    - Using, reproducing, or distributing any AI-cloned voice or likeness of Plaintiff Craig Schmitman;
    - Training any AI model on Plaintiff’s voice without express written consent;
    - Falsely implying Plaintiff’s endorsement or participation in any of Defendant’s materials;
9. For injunctive relief, a court order that Defendants permanently destroy any and all AI-cloned voice models, training data, and related materials that were

created using the Plaintiff's voice without express written consent. This includes, but is not limited to, any digital files, datasets, algorithms, and software that contain or utilize the Plaintiff's voice or likeness.

10. For costs of suit incurred herein; and

11. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff CRAIG SCHMITMAN hereby demands a trial by jury on all causes of action and claims so triable.

Respectfully submitted this December 4, 2025,

SELECT IP LAW CORPORATION

*/s/ Ashkon Cyrus*

Ashkon E. Cyrus, Esq.
(SBN 314523)
475 Washington Blvd
Marina Del Rey, CA 90292
Telephone: (310) 893-2088
Email: ashkon@selectip.com

*Attorney For Plaintiff*